COURT OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                      FORT
WORTH

 

 

                                          NO.
02-08-125-CV

 

 

IN THE
INTEREST OF M.C., N.L., AND D.L., 

CHILDREN                                                                                            

 

                                                  ------------

 

             FROM THE 324TH
DISTRICT COURT OF TARRANT COUNTY

 

                                                  ------------

 

                                  MEMORANDUM OPINION[1]

 

                                                  ------------

I. Introduction

In four issues, Appellant E.C. contests the
sufficiency of the evidence to support the termination of her parental rights
to M.C., N.L., and D.L.  We affirm.

II. Factual and Procedural History








At the time of the termination trial in March
2008, M.C. was seven years old, N.L. was five years old, and D.L. was two years
old.  M.C. and N.L. had previously been
removed from E.C. in 2004, after a referral to Child Protective Services (CPS)
by a neighbor resulted in E.C.=s arrest
for possession of a controlled substance. 
E.C. completed her service plan while pregnant with D.L., and in June
2006, CPS returned her children to her.








E.C. testified that she was currently
incarcerated because she had violated the terms of the four years=
community supervision she received for the deferred adjudication of the 2004
possession charge.  She also testified
that, with regard to the Acrack cocaine@ that
led to her arrest in 2004, she had not been using it; N.L. and D.L.=s
father, R.L., had given it to her to sell for him.[2]  She also testified that she knew nothing
about selling drugs, that she only did it twice, and that she did it so that he
would not Aput his hands on [her],@ i.e.,
physically abuse her.  She testified that
when she sold crack cocaine, she would leave M.C. with her mother and turn the
sales profits over to R.L.; that R.L. was mentally, physically, and sexually
abusive to her throughout 2004; and that he would beat her while the children
were asleep.[3]  She added that sometimes the children were
awake and saw the domestic violence between her and R.L.; she did not know if
he had ever harmed the children.

E.C. also testified that she used marijuana
around her children, then immediately contradicted herself, stating, ANo, I
don=t use
drugs around my kids,@ and then explained that she
would smoke Aweed@ outside
on her patio while her children were inside the house.  She admitted that she had cared for her
children while under the influence of marijuana and that she had allowed R.L.
and his girlfriend to care for the children when R.L. was under the influence
of drugs. 








E.C.=s
community supervision was revoked because, in December 2006, she committed
assault with bodily injury against the mother and sister of R.H., her alleged
common law husband;[4]
she was also charged with, and she pleaded guilty to, harassment and criminal
trespass.  E.C. claimed that R.H.=s mother
attacked E.C. first, in front of the children, and that E.C. hit her back.  E.C. testified that she gave R.H. temporary
custody of her children when she knew she was going back to jail for violating
the terms of her community supervision. 
She also testified that R.H. had a girlfriend while E.C. was
incarcerated and that he was unable to take care of E.C.=s
children because Ahim and his girlfriend were
having confrontations, or whatever.@

In March 2007, the State placed the children into
foster care.  In the affidavit the State
submitted in support of its request for temporary managing conservatorship, the
CPS caseworker averred that E.C. asked a friend to call CPS and request removal
of the children from R.H. and for CPS to place them in foster care.  E.C. testified that she remained in jail from
March to July, that she had no contact with her children or R.H. during that
time, that neither CPS nor R.H. notified her that her children were placed into
foster care or taken away from R.H. while she was in jail, and that CPS did not
mail her a service plan while she was in jail. 
She testified that a friend wrote to her in April or May and told her
that her children were in foster care and that CPS Anever
gave [her] a service plan due to the fact that [she] knew what a service plan
was.@  E.C. testified, AI just
knew what I had to do,@ but she also testified that she
did not know what a service plan was. 
She testified that she called CPS the day that she was released from
jail but that the caseworker was out of the office that day.








E.C. testified that when she was released in
July, she attempted to work on her service plan.  E.C. acknowledged working her CPS service
plan from 2004 to 2006 to get her children back but stated that with regard to
the second time her children were placed into foster care, AI didn=t know
that they actually wanted me to take these classes over again[,] [s]o I was
aggravated with that situation.@ 

E.C. testified that she tried to complete the
service plan.  She stated, Awhenever
I=m out
[of jail], I go see my children@; that
she was hampered in her ability to get her drug tests and other services
because she did not have identification and a caseworker was supposed to go
with her;[5]
and that she visited her children around four or five times before she was
arrested again in September 2007 when R.H. accused her of committing criminal
trespass.[6]  E.C. also testified that while she was out of
jail, she had a job and a house that her grandfather had left to the family, so
her Akids got
a free bedroom.@








The ongoing CPS caseworker testified that E.C.
did not make any appropriate progress on her service plan while she was out of
jail.  She testified that the three
children had been in the same foster home for six to seven months; that the
children called their foster mother, AMom@; that
the children had stability and were progressing because of that stability; and
that every time they visited any of their biological family, according to the
foster mother, the children regressed behaviorally and emotionally by becoming
very aggressive and by having Aaccidents
in their pants.@ 
According to what the CPS caseworker had been told by the foster mother,
two-year-old D.L. had Athe foul-language vocabulary of
an adult man,@ which manifested only after
visits with his biological family.  She
recommended that E.C.=s parental rights be terminated;
she testified that the State=s plan
for the children was for them to be adopted by their current foster parents.

The children=s
attorney ad litem testified that he made numerous home visits with the children
and their foster mother, that the foster home was very stable, and that the
children were very well cared for there. 
He testified that after visits with E.C., the children were very
despondent and suffered a negative impact on their overall mental health.  He agreed that the only words D.L. knew were
profane and that he could reasonably state that D.L. did not learn those words
in the foster home.  He testified that
the foster mother told him that she was willing to adopt the children and opined
that she would be the best person to adopt the children.  He recommended termination of E.C.=s
parental rights.








The trial court terminated E.C.=s
parental rights, finding by clear and convincing evidence that she knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings that endangered the children=s
physical or emotional well-being; that she engaged in conduct or knowingly
placed the children with persons who engaged in conduct that endangered the
children=s
physical or emotional well-being; that she constructively abandoned the
children; and that termination of E.C.=s
parental rights to the children was in the children=s best
interest.  See Tex. Fam. Code Ann.
'' 161.001(1)(D),
(E), (N), 161.001(2) (Vernon Supp. 2008). 
This appeal followed.

III. Discussion

E.C. complains that the evidence is not legally
and factually sufficient to support the trial court=s
endangerment and constructive abandonment findings under section 161.001(1) and
that the evidence is not factually sufficient to support the trial court=s best
interest finding under section 161.001(2). 

A. Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at
20B21;
In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987). 








Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77,
83 (Tex. App.CFort Worth 2006, pet.
denied).  It is defined as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. ' 101.007
(Vernon 2002).








In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a fact-finder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
fact-finder resolved any disputed facts in favor of its finding if a reasonable
fact-finder could have done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.

We must therefore consider all of the evidence,
not just that which favors the verdict. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations
as long as they are not unreasonable.  Id.
at 573.








In reviewing the evidence for factual
sufficiency, we must give due deference to the fact-finder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a fact-finder could reasonably form a firm conviction or belief that
the parent violated the endangerment or constructive abandonment provisions of
section 161.001(1) and that the termination of the parent=s
parental rights would be in the best interest of the children.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108. 

B. Endangerment

In her first two issues, E.C. complains that the
evidence is not legally and factually sufficient to support the trial court=s
findings under subsections (D) and (E) because she Adid not
voluntarily, deliberately, and consciously engage in a course of conduct@ that
endangered the children and that her conduct did not create an environment
detrimental to the children=s
well-being.

The court may order termination of the parent‑child
relationship if the court finds by clear and convincing evidence that the
parent has engaged in conduct or knowingly placed the child with persons who
engaged in conduct that endangers the child=s
physical or emotional well‑being. 
Tex. Fam. Code Ann. ' 161.001(1)(E).  AEndanger@ means Amore
than a threat of metaphysical injury or the possible ill effects of a less‑than‑ideal
family environment, [but] it is not necessary that the conduct be directed at
the child or that the child actually suffers injury.  Rather, >endanger= means
to expose to loss or injury; to jeopardize.@  Boyd, 727 S.W.2d at 533 (citation
omitted); In re J.M.M., 80 S.W.3d 232, 241 (Tex. App.CFort
Worth 2002, pet. denied), disapproved on other grounds, In re J.F.C.,
96 S.W.3d 256 (Tex. 2002).  








Under subsection (E), the relevant inquiry is
whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, and failures to act, and it must be based
on more than a single act or omission; a voluntary, deliberate, and conscious
course of conduct by the parent is required. 
J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.); J.M.M., 80 S.W.3d at 241; see also In re U.P.,
105 S.W.3d 222, 236 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied) (holding that the creation of an Aemotional
vacuum@ in the
child=s life
by being absent for more than twelve months due to incarceration was evidence
of endangering the child=s emotional well-being).  The specific danger to the child=s well‑being
may be inferred from parental misconduct alone. 
Boyd, 727 S.W.2d at 533.








To determine whether termination is necessary
because of endangerment, courts may look to parental conduct both before and
after a child=s birth.  In re D.M., 58 S.W.3d 801, 812 (Tex. App.CFort
Worth 2001, no pet.).  Conduct that
subjects a child to a life of uncertainty and instability endangers the child=s
physical and emotional well‑being. 
See In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan
Antonio 1998, pet. denied) (using illegal drugs and violating parole provided
sufficient evidence of endangerment). 
However, the relationship of the parent and child, as well as efforts to
improve or enhance parenting skills, are also relevant in determining whether a
parent=s
conduct results in Aendangerment@ under
section 161.001(1)(E), even when the parent is incarcerated.  In re D.T., 34 S.W.3d 625, 640 (Tex.
App.CFort
Worth 2000, pet. denied).

Imprisonment is a factor to be considered by the
trial court on the issue of endangerment. 
Boyd, 727 S.W.2d at 533. 
But imprisonment alone does not constitute endangering conduct; the
State must show that the incarceration is a part of a course of conduct that is
endangering the child.  In re D.M.,
58 S.W.3d at 812B13 (noting that mother=s
frequent incarcerations affected her ability to properly care for her children
and to comply with her service plans); see also In re M.R., 243 S.W.3d
807, 819 (Tex. App.CFort Worth 2007, no pet.)
(observing that father=s incarceration affected his
ability to ensure that his child was properly taken care of, prevented him from
funding better living conditions or providing financial support for the child,
and indicated a course of conduct that was endangering to his child); D.T.,
34 S.W.3d at 639 (looking not only to incarceration as a factor in factual
sufficiency but also the expected length of sentence and whether the underlying
conduct is of a type, in and of itself, from which endangerment may be
inferred).








E.C. claims that there was Aample@
evidence that she had a history of cooperating with the State and progress on
her service plan and that the removal was based only on her incarceration and
not on any abuse allegations. E.C. cites in support of her argument her
employment prior to her incarceration and intent to return to employment
postincarceration; her visits with the children after they were placed in
foster care, as well as the fact that she did not cancel or miss any scheduled
visits; and the administrative difficulties that she encountered in working on
the service plan.  E.C. states that while
there was evidence of her past involvement with illegal drugs, there was also
evidence that she tried to protect the children from being exposed to drugs in
the home and that she provided for the children=s
medical needs in an appropriate manner.








The record reflects that E.C., if not her children,
suffered from domestic violence at R.L.=s hands;
that E.C. used drugs while her children were home; that E.C. repeatedly
violated her community supervision, at least once in a violent manner; and that
E.C. left her children with someone who was unprepared to care for them when
she went to jail.[7]  And notwithstanding the evidence referred to
above by E.C., her own testimony reflects a pattern of conduct that endangered
her children by subjecting them to significant uncertainty and instability.  She testified, AI guess,@ when
asked whether she was aware that a new violation of her community supervision
could result in revocation when she committed the December 2006 assault, which
resulted in the children=s March 2007 removal.  Only a month and a half after being released
from prison for that assault, she committed another violation, resulting in her
incarceration during the termination trial. 
When testifying about how R.L. abused her, E.C. asked, AWhat
does this have to do with my children?@
although she later acknowledged that exposing the children to a pattern of
domestic violence could harm the children in the long run.  When asked why she thought the trial court
should not terminate her parental rights, E.C. replied, ABecause
I=m not
really with [R.L.].  I really wasn=t with
[R.L.].  The reason me and my husband
[R.H.] keep getting into it [is] because he thinks I=m going
to go back to [R.L.].@








Furthermore, the evidence to which E.C. refers in
order to demonstrate that she tried to protect the children from being exposed
to drugs in her home could have, instead, been construed by the trial court as
more evidence that E.C.=s overall course of conduct
endangered the children.  E.C. testified
that she discovered that R.L. sold crack cocaine out of her apartment, stating,
AWhen I
came home in 2004 from being arrested, I found that baggie in my house, and one
day I seen him in the restroom cutting up the crack.  And I told him, I say, >Don=t do
that in front of my kids.=@  And while she testified that the drug sales
occurred during 2001 and 2004, E.C. did not set a date with regard to when she
smoked marijuanaCAthe only
drug I use, if that=s what you want to call it@Coutside
her home while her children slept or played inside.  She also admitted that she cared for the
children while under the illegal drug=s
influence. 








Some of E.C.=s
testimony about her cooperation with the State and progress on her service plan
was contradictory:  she stated that she
did and did not know what a service plan was and that there were
misunderstandings between herself and CPS.[8]  She testified both that she did and did not
behave appropriately at all CPS visits with her children.  Her testimony about her performance of the
service plan was disputed by the CPS caseworker=s
testimony that E.C. had not made appropriate progress on her service plan. With
regard to her testimony about  providing
for her children=s medical needs, E.C. was unable
to name the doctor that the children currently went to, stating, AI don=t
know.  All my kids take karate.@  But she was able to name the one she had used
when the children lived with her and testified that she would take them A[f]or
their checkup.@

The trial court could have reasonably resolved
the only disputed fact, E.C.=s
service plan performance, in favor of the endangerment finding based on the CPS
caseworker=s testimony and E.C.=s own
testimony about the service plan. 
Reviewing the evidence in the light most favorable to the endangerment
finding and the judgment, we conclude that the trial court could have
reasonably formed a firm belief or conviction that E.C.=s
conduct endangered her children.  See
J.P.B., 180 S.W.3d at 573.  And,
giving due deference to the trial court=s
finding, with regard to the entire record, the trial court could also have
reasonably formed the same firm conviction or belief that E.C.=s
conduct met the requirements of subsection (E). 
See H.R.M., 209 S.W.3d at 108; C.H., 89 S.W.3d at 28.  Therefore, we conclude that the evidence was
both legally and factually sufficient to terminate E.C.=s
parental rights based on the endangerment by conduct ground in subsection (E),
and we overrule her second issue.[9]

 








 

C. Best Interest

In her fourth issue, E.C. complains that the
evidence is not factually sufficient to support the trial court=s best
interest finding under section 161.001(2) of the family code.

Prompt and permanent placement of the child in a
safe environment is presumed to be in the child=s best
interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  There is also
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the children include the children=s
desires;  the children=s
emotional and physical needs, now and in the future; the emotional and physical
danger to the children now and in the future; the parental abilities of the
individuals seeking custody; the programs available to assist these individuals
to promote the best interest of the children; the plans for the children by
these individuals or by the agency seeking custody; the stability of the home
or proposed placement; the acts or omissions of the parent which may indicate
that the existing parent‑child relationship is not a proper one; and any
excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976). 








These factors are not exhaustive; some listed factors
may be inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

E.C. specifically contends that the evidence at
trial presents a clear conclusion that termination of her parental rights is
not in the children=s best interests when considered
in light of the children=s emotional and physical needs
and the excuses for her acts or omissions. 
With regard to the children=s
emotional and physical needs, now and in the future, she claims, based on her
testimony that D.L.=s emotional state has declined
since his placement in foster care and that M.C. failed to advance to first
grade, that there have clearly been significant setbacks in the children=s
emotional development since their removal.








Some of E.C.=s
evidence is contradicted by her own testimony: she testified that M.C. Aflunked@ kindergarten
Adue to
the fact that [E.C.] went to jail.@  E.C. testified that there was nothing wrong
with D.L. when she left him and that she never used foul language in front of her
children.  The CPS caseworker testified
that D.L. was not speaking at an appropriate level, that he was receiving
speech therapy, and that he would use foul adult language after visits with his
biological family members.  She testified
that M.C. and N.L. receive tutoring through their school, lots of help from
their foster mother, and counseling.

E.C. next argues that, with regard to excuses for
her acts or omissions, there was Aample
evidence regarding difficulties that [she] encountered while attempting to
parent the children,@ including evidence indicating
that she was a victim of severe mental, physical, and sexual abuse; that she
encountered administrative difficulties with CPS that prevented her completion
of some of the services in her service plan; and that her incarceration
hampered her ability to complete the services. 
Notwithstanding E.C.=s
undisputed problems, however, the record reflects that the trial court could
have reasonably concluded that some, if not all, of E.C.=s
problems stemmed from her own choices, made without apparent regard for the
best interest of her children.








The CPS caseworker testified that all three
children had been in the same foster home for six to seven months, that the
children had stability in that home, that the children were progressing because
of that stability, and that it would be disruptive to the children=s
progress to be returned to E.C. because each time the children visited with
their biological family members, Athere is
a behavioral and emotional regression.@  She testified that the State=s plan
for the children was for them to be adopted by their current foster
parents.  The children=s
attorney ad litem also testified that the foster home was very stable, that the
foster family took good care of them, that the foster mother told him that she
was willing to adopt the children, and that he thought she would be the best
person to adopt them.  E.C. testified
that she had a place for the children to stay, but she provided no description,
other than to establish that the children had Asomewhere
to stay@ in the
house that her grandfather left to the family.

The CPS caseworker testified that she had
observed the children with their foster family, that they seemed very relaxed,
that they referred to their foster mother as AMom,@ and
that they acted like they were at home. 
The children=s attorney ad litem testified
that the children reported to him that they enjoyed the environment in the
foster home; he also testified that he thought the children=s visits
with their biological family had a negative effect on the children.








Based
on the entire record, the trial court could have reasonably formed a firm
conviction or belief that termination of E.C.=s parental rights would
be in the best interest of the children. 
See C.H., 89 S.W.3d at 28. 
Therefore, we conclude that the evidence to support the trial court=s best interest finding
was factually sufficient, and we overrule E.C.=s fourth issue.

 

IV. Conclusion

Having overruled E.C.=s
dispositive issues,[10]
we affirm the trial court=s judgment terminating E.C.=s
parental rights to M.C., N.L., and D.L.

 

PER
CURIAM

 

PANEL: MCCOY, HOLMAN, and
GARDNER, JJ.

 

DELIVERED: October 9,
2008

 

 











[1]See Tex. R. App. P. 47.4.





[2]In the same proceeding,
the trial court also terminated the parental rights of R.L., the adjudicated
father of N.L. and D.L., and of F.W., M.C.=s alleged biological father.  R.L. and F.W. did not appeal.





[3]R.L. testified that he
physically assaulted E.C. but that he Anever beat her. 
Just smacked her up.@  He
testified that the children were in the house, asleep in their room, when he
abused their mother.  He testified that
the children never saw him assault E.C.





[4]E.C. testified that she
began a relationship with R.H. in 2001. 
She testified that they were common law married because they were
beneficiaries on each other=s health insurance.





[5]E.C. testified that she
needed her birth certificate, her social security card, and her identification
for the services and that she lost all of those items when she lost her
apartment.





[6]E.C. testified that R.H.
sought and received a protective order against her for coming onto his property
and stealing his dog and that R.H. was supposed to get the protective order
removed because she did not actually steal his dog.





[7]E.C. testified that it
was her understanding that the children were going to stay with R.H. while she
was incarcerated and that R.H. never informed her that her children were put
into foster care in March 2007.





[8]E.C. testified that she
attempted to work services in July when she was released from jail, that CPS
aggravated her by making her retake some classes that she had previously taken
during the earlier removal of her children in 2004, and that no one from CPS
ever took her to get her drug tests done. 
She testified that she did have a job, attended visits with the
children, had not taken any drugs, did her psychological evaluation, and had
been working with her caseworker.





[9]Because, along with a
best interest finding, a finding of only one ground alleged under section
161.001(1) is sufficient to support a judgment of termination, we need not
address E.C.=s first and third
issues.  See Tex. R. App. P. 47.1;
see also E.M.N., 221 S.W.3d at 821. 





[10]See Tex. R. App. P. 47.1.